# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARREN L. MILLER** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **NO. 06-1080** |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

March _18__, 2010                                                                 Anita B. Brody, J.

## <u>MEMORANDUM</u>

### I. Introduction

In this § 1983 action, Darren L. Miller, a Pennsylvania State prisoner currently incarcerated at the State Correctional Institution at Pittsburgh ("SCI Pittsburgh"),[1] alleges:  (1) deliberate indifference to his serious medical needs under the Eighth and Fourteenth Amendments to the United States Constitution, (2) retaliation under the First and Fourteenth Amendments, and (3) denial of due process under the Fourteenth Amendment.  Each defendant, except for MHM Correctional Services, Inc. ("MHM"), which contracts to provide mental health services to inmates for the State Department of Corrections ("DOC"), moves for summary judgment.[2]

---

[1] Venue is not at issue because Miller was incarcerated at SCI Graterford when he initiated this action.

[2] Miller directs his deliberate indifference claim against Mark Sokolski, R.N., a state employee listed in the Second Amended Complaint as "Nurse Mark"; Mark Fishstein, D.O., a psychiatrist employed by MHM to provide mental health care to inmates at SCI Graterford; Prison Health Services, Inc. ("PHS"), which provides medical services to DOC inmates; and Felipe Arias, M.D., a medical professional employed by PHS to provide medical care to inmates at SCI Graterford; all of whom are sued in their individual capacities.

With regard to the deliberate indifference claim against Defendants Mark Sokolski, R.N., Mark Fishstein, D.O., Felipe Arias, M.D., and Prison Health Services ("PHS"), I will grant summary judgment for Nurse Sokolski, Dr. Arias, and PHS, and I will deny summary judgment for Dr. Fishstein. With regard to Miller's retaliation and due process violation claims against Defendants Jeffrey Beard and David DiGuglielmo, I will grant summary judgment in favor of both defendants on mootness grounds.

## II. BACKGROUND[3]

Miller has been in state custody since August 1998. He spent his first three years of incarceration at SCI Pittsburgh, SCI Camp Hill, and SCI Greene. From January 2001 through July 2007, Miller was incarcerated at SCI Graterford. In July 2007, Miller was transferred to SCI Camp Hill and then was sent back to SCI Pittsburgh, where he currently resides. (Opp. to Dr. Fishstein's Mot. Summ. J. [hereinafter "Opp., Fishstein Mot."], Miller Dep. 8:13-22, July 31, 2008; Statement of Undisputed Facts ¶¶ 2, 3.) Miller's claims revolve primarily around three incidents: (1) the discontinuance of his psychotropic medications on July 25, 2005; (2) the discontinuance of his allergy and migraine medication in the fall of 2005; and (3) his transfer from SCI Graterford to SCI Camp Hill in 2007.

---

Miller directs his retaliation and due process claims against Jeffrey Beard, the Secretary of the DOC, and David DiGuglielmo, the Superintendent of SCI Graterford, in their official capacities.

[3] On a motion for summary judgment, the facts are interpreted in the light most favorable to the non-moving party. All facts are taken from Miller's Second Amended Complaint, Miller's briefs in opposition to the defendants' motions for summary judgment, and Miller's medical records provided by both sides in their various filings.

## A. **Denial of Psychotropic Medication**

### 1. **History Prior to July 25, 2005**

Miller has a lengthy and well-documented history of both mental illness and behavioral misconduct. Between 1998 and 2006, Miller was diagnosed with mental health conditions such as: (1) bipolar disease; (2) depressive disorder; (3) schizoaffective disorder; (4) impulse control disorder; and (5) severe antisocial personality disorder. (*Id*. at Statement of Undisputed Facts ¶ 5.) Until July 25, 2005, Miller was treated for these conditions with the following psychotropic medications, in varying combinations and dosages: (1) Seroquel, an antipsychotic agent; (2) Tegretol, an antiseizure medication used as a mood stabilizer and to counteract aggressive impulses; (3) Risperdal, a tranquilizer used for high anxiety and states of impulsivity; (4) Sinequan, which manages anxiety and depression and induces sleep; (5) Elavil, an antidepressant like Sinequan; (6) BuSpar, an anti-anxiety medication; (7) Klonopin, primarily used for the control of anxiety on a short-term basis; and (8) Lexapro, an antidepressant. (*See id*. at Ex. C; Ex. F, Fishstein Dep. 22:13-23:23, 72:19-21, Aug. 5, 2009.)

Miller also has a long history of misconduct. For example, between March 29, 1999 and May 30, 2006, Miller was cited for 96 behavioral violations, such as aggravated assault, threatening staff, using abusive or obscene language, sexual harassment, self-mutilation, indecent exposure, and property destruction. (*See id*. at Ex. C.) Due to the combination of his mental illness problems and his behavioral outbursts, Miller spent much of his time at SCI Graterford shuttling between the Restricted Housing Unit ("RHU"), the Special Needs Unit ("SNU"), an isolated area of the prison dedicated to housing mentally ill inmates, and the Psychiatric Observation Cell ("POC") Unit, which consisted of four individual cells for suicidal, homicidal,

violent, psychotic, and delirious inmates. (*See id*. at Ex. F, Fishstein Dep. 8:15-22; 12:12-18.) He has also spent time at Waymart Hospital, a DOC mental health facility. (*See id*. at Ex. C.)

In January 2005, Dr. Mark Fishstein began working at SCI Graterford as a psychiatrist employed by MHM to provide mental health services to the prison's inmates. Dr. Fishstein began treating Miller soon after he arrived at SCI Graterford. He was aware of Miller's substantial mental health problems, (*id*. at Ex. F, Fishstein Dep. 25:17-21), and he relied heavily on psychotropic medications to manage Miller. For example, on March 10, 2005, Dr. Fishstein examined Miller, found him to be "verbally hostile," and possibly suicidal, and prescribed Seroquel for him. (*Id*. at Ex. J.) On April 21, 2005, after Miller was admitted to the POC on a suicide watch, (*see id*. at Ex. I), Dr. Fishstein prescribed Klonopin for him. (*Id*. at Ex. J.) On June 2, 2005, Dr. Fishstein met with Miller, noted that he reported feeling stable, and continued his prescriptions for Seroquel, Klonopin, Lexapro, and Tegretol. (*Id*. at Ex. K.)

At some point during these visits in the spring of 2005, Miller was caught hoarding his medication. At that time, Miller admitted to a medical professional that he was hoarding and explained that he was contemplating suicide by overdosing on his medication. (*Id*. at Ex. P.)

Nurse Mark Sokolski began working at SCI Graterford in 2001. He was often staffed in different wings of the prison, but by 2005 his primary duty involved the administration of medication in the RHU. Typically, Nurse Sokolski would prepare the inmates' medication and then go from cell to cell, accompanied by a correctional officer ("CO"), depositing the appropriate medication in a wicket attached to the inmate's cell door. He was supposed to watch the inmate take the medication, but he admits that on occasion he failed to do so. (*Id*. at Ex. G, Sokolski Dep. 17:10-19:4, Apr. 23, 2009.)

Miller, a frequent resident of the RHU, was well known to Nurse Sokolski. Nurse Sokolski had treated Miller prior to 2005 on occasion in the prison's infirmary, in the POC, and in the SNU. (*Id*. at Ex. G, Sokolski Dep. 9:14-11:14.) Nurse Sokolski knew that Miller had a long history of serious mental health problems and that Miller was under Dr. Fishstein's close supervision and psychiatric care. (*Id*. at Ex. G, Sokolski Dep. 15:11-14; 14:18-19.) In the RHU, Miller was frequently verbally abusive towards Nurse Sokolski when the nurse came to dispense his medications. (*Id*. at Ex. G, Sokolski Dep. 19:23-20:5; Ex. A, Miller Dep. 22:19-23:8.) Nurse Sokolski admits that Miller's abuse upset him. (*Id*. at Ex. G, Sokolski Dep. 21:10-18.)

### 2. July 25, 2005 Incident and Follow-up Care

On July 25, 2005, Nurse Sokolski visited Miller's cell to give him his medications. Nurse Sokolski wrote in Miller's medical records that Miller said, "[Expletive] you, you [expletive] nurse, I'll take my [expletive] meds when I want to." (*Id*. at Ex. L.) Miller admits that he verbally abused Nurse Sokolski, but claims that the nurse had cursed at him first. Miller denies saying that he would not take his medication. (*Id*. at Ex. A, Miller Dep. 79:6-16.) Nurse Sokolski also wrote that Miller was "playing games" with his medication and was deliberately and hazardously noncompliant with his medication. (*Id*. at Ex. L.) Nurse Sokolski wrote that he discussed the situation with Dr. Fishstein who told him to discontinue Miller's medication until further notice ("discontinuance order"). Dr. Fishstein also ordered that Miller be put in the POC until Dr. Fishstein could examine him. (*Id*.)

On August 29, 2005, Miller wrote a letter to Dr. Fred R. Maue, Chief of Clinical Services at the DOC's Bureau of Health Care Services, in which Miller complained that he was denied his medications and that Dr. Fishstein refused to see him. (*Id*. at Ex. A, Miller Dep. 31:13-32:3.) It

is not clear whether Dr. Fishstein was aware of the letter, but on August 30, 2005, he made his first attempt to follow up with Miller. Dr. Fishstein was unable to see Miller that day and he did not change his discontinuance order. (*Id*. at Ex. K.)

On September 18, 2005,[4] Miller filed an official grievance in which he stated that his medications had been abruptly discontinued and that Dr. Fishstein refused to see him. (*See id*. at Ex. P.) Miller's grievance was denied on September 26, 2005 by Myron Stanishefski, a DOC Health Care Administrator. Stanishefski explained to Miller that his medications had been discontinued because of his aggressive behavior towards the staff and his history of hoarding medication. Stanishefski informed Miller that he was scheduled to see a psychiatrist on September 26, 2005. (*Id*.)

On September 27, 2005, Dr. Fishstein made a second attempt to see Miller, but RHU officials requested that the doctor refrain from seeing Miller that day. (*Id*. at Ex. K.) On October 4, 2005, Dr. Fishstein examined Miller for the first time since the July 25 incident. He noted that Miller was "hostile . . . [and] defiant," and that Miller refused to answer questions about his mental health. Dr. Fishstein concluded that Miller had no clinical need for psychotropic medications and decided to have his psychology colleagues monitor Miller's behavior. (*Id*. at Ex. N.)

On October 5, 2005, the day after Dr. Fishstein's examination, Miller appealed the denial of his grievance. Without referencing his meeting with Dr. Fishstein, Miller argued that he had been accused of aggressive behavior many times before, and had admitted to hoarding several months prior to July 25, and yet he had never been denied his medications. He could not

---

[4] Although the date listed is on the grievance is September 18, 2006, this is clearly a typographical error because the grievance is stamped as "Received" on September 21, 2005. (*See* Opp., Fishstein Mot., Ex. P.)

understand why officials were citing such behavior to support their decision to discontinue his psychotropic medications. Miller asserted that Nurse Sokolski disliked him and had threatened that he would make sure that Miller's medications would be discontinued. (*Id.* at Ex. P.)

On October 11, 2005, Miller wrote to Dr. Maue again. He reiterated his previous complaints that the staff was attempting to "grind him up"–punish him–in retaliation for his grievances against them. He asserted that without his medications, he was hearing voices and feeling depressed and irritable. (*Id.* at Ex. A, Miller Dep. 32:22-34:5.)

On October 12, 2005, Superintendent DiGuglielmo denied Miller's appeal, citing Miller's admission that he had hoarded medication and been aggressive towards the staff. On October 26, 2005, Dr. Maue responded to Miller's October 11 letter. Dr. Maue explained to Miller that his medications had been discontinued due to his non-compliance. Dr. Maue also noted that the SCI Graterford staff had reported that Miller was defiant and hostile towards them and had thrown bodily fluids on the COs. Dr. Maue wrote that he would tell Dr. Fishstein that Miller felt that his psychotropic medications improved his behavior, but he also encouraged Miller to establish a better relationship with the staff and work on being compliant when medication was prescribed for him. (*See* Opp. to Dr. Arias Mot. Summ. J. [hereinafter "Opp., Arias Mot."], Ex. A.)

On November 1, 2005, Dr. Fishstein spoke with Miller at Miller's cell. Dr. Fishstein noted that Miller was "stable" but "quietly defiant," so he decided to continue monitoring Miller without prescribing him any medication. (Opp., Fishstein Mot., Ex. N.) On December 2, 2005, Miller filed a final appeal, in which he stated that he was being denied medications because of his aggressive actions, the very behavior that the medications were intended to control. Miller asserted that his medications were discontinued for punitive, rather than medical, reasons. On

December 28, 2005, Miller's final appeal was dismissed as untimely.[5]  (*Id*. at Ex. P.)

On June 20, 2006, Dr. Fishstein provided a summary of Miller's treatment from July 25, 2005 forward.  Dr. Fishstein wrote that Miller's medications were intended to control his agitation and aggression, but that Miller misused them.  Dr. Fishstein also noted that Miller interacted with the staff in a violent and degrading manner.  Dr. Fishstein underlined that after he discontinued Miller's medications, there was no change in Miller's behavior.  Dr. Fishstein felt that this confirmed that there was "no primary psychiatric diagnosis–and that all [of Miller's] behavior was . . . willful and self-determined."  (*Id*. at Ex. O.)

After the incidents of July 25, 2005, Dr. Fishstein never again prescribed psychotropic medications for Miller.  However, on December 19, 2006, Dr. Sheila McDermott began prescribing Risperdal, a tranquilizer, and Mirtazapine, an antidepressant, for Miller.  (*Id*. at Ex. R.)  In addition, on May 4, 2007, a psychiatrist examining Miller noted that he was compliant during the interview and appeared stable.  Miller, however, asked to be put on Tegretol because it helped his mood; the psychiatrist then prescribed Risperdal and Tegretol for him.  (*Id*. at Ex. S.)

### B.  Denial of Migraine and Allergy Medication

Prior to 2005, Miller was prescribed Albuterol, CTM, and saline nasal spray for seasonal allergies and asthma, and Midrin for migraine headaches.  (*See id*. at Exs. C, H, & L.)  In the early summer of 2005, Miller began asking repeatedly that his Midrin prescription be renewed

---

[5] None of the defendants raise Miller's failure to file a timely final appeal as a justification for summary judgment.  While district courts have inherent authority to dismiss *sua sponte* an inmate's complaint when it is apparent from the face of the complaint that the inmate has failed to exhaust his administrative remedies, it is not appropriate to exercise such authority in this matter.  *See Ray v. Kertes*, 285 F.3d 287, 295 n.5 (3d Cir. 2002) (district courts have "inherent power to dismiss *sua sponte* a complaint which facially violates a bar to suit.").

even though his order was still valid.  When, on August 14, 2005, Dr. Felipe Arias determined

that Miller's prescription did need to be renewed, he ordered a three month supply of Midrin for

Miller consisting of a maximum of 10 pills a month.  (*See* Dr. Arias' Mot. Summ. J., Ex. E.)

On October 11, 2005, in addition to complaining about the discontinuance of his psych-

otropic medications, Miller wrote to Dr. Maue and stated that he was not receiving Midrin and

that Dr. Felipe Arias had discontinued his CTM medication.  (Opp., Fishstein Mot., Ex. A, Miller

Dep. 34:6-23.)  On October 17, 2005, Dr. Arias renewed Miller's CTM prescription for 90 days.

(Dr. Arias' Mot. Summ. J., Ex. E.)  On October 26, 2005, Dr. Maue replied to Miller, writing

that he would ask Dr. Arias to evaluate Miller's need for Midrin.  (Opp., Arias Mot., Ex. A.)

On November 29, 2005, Miller filed a grievance in which he stated that on November 21,

2005, he had asked Nurse Sokolski for his migraine headache medicine and that Nurse Sokolski

had replied that the infirmary had run out of the medication.  Miller wrote that there had been

several instances in which Nurse Sokolski had told him that his Midrin prescription needed to be

reordered, but when Miller asked a different nurse later, the Midrin was available for him.  Miller

asserted that Nurse Sokolski threatened to have Miller's doctor discontinue the Midrin if Miller

continued to complain about it.  Finally, Miller stated that on November 25, 2005, Dr. Arias told

him that his medications would not be reordered.  (*See id*. at Ex. A.)

On December 16, 2005, Miller's grievance was denied by Mr. Stanishefski, who

explained that on November 21, 2005, Miller lacked a current doctor's order for Midrin and

therefore Nurse Sokolski had been legally prohibited from dispensing the medication to Miller.

Stanishefski added that Miller's grievance was moot because his Midrin, CTM, and saline spray

prescriptions had been renewed.  On December 18, 2005, Miller filed an appeal.  He stated that

although he began receiving his medications on December 15, 2005, they were discontinued on December 17, 2005. Indeed, Miller's Midrin, CTM, and nasal spray prescriptions had been discontinued on December 17, 2005 by Dr. Caleb Nwosu, who had concluded that Miller was asymptomatic. (*See* Dr. Arias' Mot. Summ. J., Ex. E.)

On January 12, 2006, Superintendent DiGuglielmo's office investigated the allegations in Miller's appeal. Mr. Stanishefski explained that Miller's medications had been discontinued on December 17, 2005 and that there was "documentation that there [was] no need for these medications." (*Id*. at Ex. D). Stanishefski added that Miller was "extremely abusive" any time he was seen by anyone. (*Id*.) In light of this information, on January 13, 2006, Superintendent DiGuglielmo denied Miller's appeal. On March 22, 2006, the DOC's Chief Grievance Officer denied Miller's final appeal after concluding that Miller's medications had been renewed. (*Id*.)

### C.  Retaliation

On March 31, 2006, Miller initiated this action. On May 18, 2007, I ordered the Clerk of the Court to appoint counsel for Miller. On June 25, 2007, Miller's counsel entered an appearance with this Court. On July 17, 2007, Joseph B. Yodis, a prison administrator at SCI Graterford, requested that Miller be transferred to SCI Camp Hill. Yodis explained that Miller had been involved in a fight with another inmate and was "repeatedly verbally inappropriate with a particular female staff member." (*See* Opp., Fishstein Mot., Ex. B.) Miller contends that the other inmate attacked him and that the incident was used by prison administrators to transfer him to SCI Camp Hill, which was farther away from Miller's counsel than SCI Graterford, in retaliation for Miller's filing this action. Miller was transferred to SCI Camp Hill, but has since been transferred to SCI Pittsburgh, where he wishes to remain.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir. 1997). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the non-moving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The non-moving party cannot rely upon "bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324.

The threshold inquiry at the summary judgment stage involves determining whether there is the need for a trial, that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52.

## IV. Discussion

To state a valid claim under § 1983, a plaintiff must "allege the violation of a right secured by the Constitution and law of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).[6] In addition, a plaintiff must demonstrate a "close causal connection" between his injury and a defendant's conduct. *Little v. Lycoming County*, 912 F. Supp. 809, 818 (M.D. Pa. 1996). "To establish the necessary causation, a plaintiff must demonstrate a[n] . . . affirmative link between the defendant's actions and the specific deprivation of constitutional rights at issue." *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (quotation marks omitted).

Miller alleges that Nurse Sokolski, Dr. Fishstein, Dr. Arias, and PHS violated his rights under the Eighth Amendment to be free from cruel and unusual punishment by improperly depriving him of medication and/or falsifying his medical records. Miller alleges that Secretary Beard and Superintendent DiGuglielmo (a) impinged on his First Amendment right to file grievances and initiate a civil rights action by transferring him to SCI Camp Hill in retaliation for his litigious efforts; and (b) violated his right to due process under the Fourteenth Amendment by regularly transferring him to the RHU in SCI Graterford without receiving a hearing.

Before me are defendants' motions for summary judgment. Nurse Sokolski moves for summary judgment on the ground that Miller has failed to show that there is any genuine issue of

---

[6] None of the defendants dispute that, with regard to the behavior complained of in this matter, they were acting under color of state law. *Atkins*, 487 U.S. at 47-57 (physicians under contract with a state to provide medical care to the state's prison inmates, acted under color of state law when treating inmate); *see also Bivens v. Corr. Med. Servs., Inc.*, No. 05-3444 (RBK), 2006 WL 2689821, at *4 (D.N.J. Sept. 14, 2006) (noting that a private corporation acts under the color of state law when it contracts to provide medical services to state inmates).

material fact as to whether Nurse Sokolski violated Miller's rights under the Eighth Amendment. I shall grant Nurse Sokolski's motion because no reasonable juror could find that Nurse Sokolski's July 25, 2005 reporting of Miller's hoarding behavior was pretextual; even in the light most favorable to Miller, the facts show that Nurse Sokolski had a reasonable subjective fear that Miller was hoarding his psychotropic medications.

Dr. Fishstein also argues that Miller has failed to show that there is any genuine issue of material fact as to whether he violated Miller's rights under the Eighth Amendment. Dr. Fishstein is incorrect. Miller has produced evidence that Dr. Fishstein failed to follow up with Miller for two months after abruptly discontinuing at least four powerful psychotropic drugs that Miller had been taking. A reasonable jury could conclude from this that Dr. Fishstein was deliberately indifferent to Miller's serious medical needs. Dr. Fishstein contends that even if he is guilty of deliberate indifference, summary judgment should be granted in his favor because (a) Miller cannot demonstrate a close causal connection between the discontinuance order and any injury Miller suffered; and (b) Dr. Fishstein claims that he is protected by qualified immunity. Neither of these arguments save Dr. Fishstein; I will deny his motion.

Dr. Arias claims that Miller has failed to adduce facts that show that there is any genuine issue of material fact as to whether he violated Miller's rights under the Eighth Amendment in connection with the discontinuance of Miller's allergy, asthma, and migraine medication. I will grant Dr. Arias' motion because Miller has not demonstrated that his allergy, asthma, and migraine ailments rise to the level of a serious medical need.

I will grant PHS's motion for summary judgment because Miller admits that he has no evidence to support his claim against PHS.

Finally, I will grant Secretary Beard and Superintendent DiGuglielmo's motions for summary judgment because Miller's retaliation and due process violation claims against them are moot. Miller's wish to remain at SCI Pittsburgh precludes me from being able to provide him with the prospective relief that he seeks.

I shall first examine Miller's Eighth Amendment claims by defendant. I shall then address Miller's First and Fourteenth Amendment claims.

## A.  Eighth Amendment

Miller accuses Nurse Sokolski, Dr. Fishstein, Dr. Arias, and PHS of deliberate indifference to his serious medical needs. Miller believes that Nurse Sokolski and Dr. Fishstein denied him his psychotropic medications to punish him and that Dr. Arias had similar motives in denying him his allergy, asthma, and migraine medications. Miller believes that PHS sanctioned their actions through its practices, policies, and customs.

### 1.  Deliberate Indifference Standard

When prison officials and private contractors acting under the color of state law are deliberately indifferent to an inmate's serious medical needs, they violate the Eighth Amendment's ban against "cruel and unusual punishment." The Supreme Court identified the basic standard for a deliberate indifference claim in *Estelle v. Gamble,* 429 U.S. 97, 105-06 (1976): for conduct to rise to the level of deliberate indifference, a plaintiff must demonstrate that a defendant's acts or omissions constituted "an unnecessary and wanton infliction of pain" which is "repugnant to the conscience of mankind" and "offend[s] evolving standards of decency." *Id.* (quotation marks omitted). To satisfy this standard, a plaintiff must demonstrate both that (1) he had a serious medical need, and also that (2) the defendant was aware of this need and was

deliberately indifferent to it.  *See Farmer v. Brennan,* 511 U.S. 825 (1994); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979).

As to the first element, under the Constitution, prison officials must provide care only for "serious medical needs."  *Estelle,* 429 U.S. at 104.  A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (quotation marks omitted).  The seriousness of an inmate's medical need may be determined by reference to the effect of denying the particular treatment.  *See id*.

The level of culpability required to show the second element, deliberate indifference, falls somewhere between mere negligence (carelessness) and actual malice (intent to cause harm). *Farmer*, 511 U.S. at 836-37.  Negligent malpractice, standing alone, is not actionable under the Eighth Amendment.  *See Estelle*, 429 U.S. at 105-06; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1991).  A prison official can be found deliberately indifferent only if the official is "aware of facts from which the inference could be drawn that a substantial risk of serous harm exists, and [also] . . . draw[s] the inference."  *Farmer*, 511 U.S. at 837.

In evaluating claims of deliberate indifference, courts have distinguished between denial of medical treatment, like that alleged here, and inadequate medical treatment.  Mere disagree-ment as to the proper medical treatment does not support a claim of an Eighth Amendment violation; courts will defer to a treating physician's judgments regarding the propriety of a specific course of treatment.  *See Monmouth County*, 834 F.2d at 346 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).  On the other hand, where prison authorities deny reasonable

requests for medical treatment, and "such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest." *Id*. at 346 (quoting *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir. 1976)). Furthermore, if necessary medical treatment is delayed for non-medical reasons, a plaintiff has established deliberate indifference. *Id.* at 346-47 (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir.1985)). Although an isolated failure to treat, without more, is ordinarily not actionable, it "may in fact rise to the level of a constitutional violation if the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment." *Brown v. Coughlin*, 758 F. Supp. 876, 882 (S.D.N.Y. 1991) (citing *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987)).

### 2. Defendants

#### _____*a) Nurse Sokolski*

Nurse Sokolski does not dispute that Miller's mental health issues satisfy the "serious medical needs" prong of the deliberate indifference standard. Instead, Nurse Sokolski argues that Miller has failed to adduce evidence that he was deliberately indifferent to those needs. Nurse Sokolski claims that his reporting of Miller's hoarding activities on July 25, 2005, demonstrate his concern for Miller's health and safety, not deliberate indifference.

Miller claims that Nurse Sokolski, intent on punishing Miller for Miller's abusive behavior, engineered the discontinuance of Miller's psychotropic medications by falsely accusing Miller of hoarding his medication on July 25, 2005.[7] Miller has produced no direct evidence that

_____

[7] Although Nurse Sokolski's name appears in Miller's grievance regarding the denial of his allergy, asthma, and migraine medication, Miller's Second Amended Complaint only alleges that Nurse Sokolski was involved in improperly denying Miller's psychotropic medication.

Nurse Sokolski told Dr. Fishstein to punish Miller by discontinuing his psychotropic medication. Instead, Miller argues that a jury could infer that Nurse Sokolski made such comments to Dr. Fishstein from the following:

- When asked how Miller's behavior towards him affected him, Nurse Sokolski admitted that it upset him.

- On July 25, 2005, Nurse Sokolski wrote in Miller's medical records that when he attempted to give Miller his psychotropic medication, Miller responded by cursing at Nurse Sokolski and saying "I'll take my [expletive] meds when I want to." Miller claims he never made such a statement. Miller claims that after a brief argument, Nurse Sokolski told Miller that he was going to ensure that his medications were discontinued.

- When Miller filed a grievance regarding the denial of his psychotropic medication, the responses he received referenced his aggression towards staff.

- When Miller wrote to Dr. Maue regarding the discontinuance of his psychotropic medication, Dr. Maue's response referenced Miller's hostility towards the staff.

- On June 20, 2006, Dr. Fishstein explained that he discontinued Miller's psychotropic medications in part because Miller threatened and abused the nurses who dispensed his medication.

This compilation of facts and assertions would be enough to overcome summary judgment if it were not for Miller's own description of the events of July 25, 2005, which, together with Miller's history of hoarding medication, reveal that Nurse Sokolski had a reasonable subjective fear that Miller was hoarding his medication on July 25.

Miller described the July 25 incident in his grievance appeal as follows:

When Nurse Mark gave me my meds he walked away to next door gave him his meds then came back to my cell and said let me see your hands, so I say see my hands. He acts like he don't see them, so he say let me see your hands now. I tell him I am not trying to play no games with him so he's demanding to see my hands, so after a back and forth I finally tell him to if he really wants to do his job

than on his way pass the Captains office make sure he let them know that I was being forced to live in a cell with feces on the wall and was not being feed.

(*Id*. at Ex. P.)

This rendition of the July 25 incident verifies that Nurse Sokolski, after giving Miller his medications, was concerned that Miller was hiding the medication in his hands.[8] It also invalidates Miller's suggestions that Nurse Sokolski fabricated the hoarding allegation. Although Miller claims that Nurse Sokolski had a vendetta against him after becoming the recipient of a particularly vitriolic verbal assault by Miller that day, Nurse Sokolski's actions in returning to Miller's cell only highlight the nurse's concern that Miller could be suicidal or a danger to others. Nurse Sokolski admitted that Miller's abuse upset him, but he testified that the abuse usually caused him to "want to get off the tier as fast as" he could. (Ex. G, Nurse Sokolski Dep. 21:16-18). On July 25, 2005, rather than hurry off the RHU tier after giving Miller his medications, Nurse Sokolski returned to Miller's cell to check Miller's hands to see if he was hoarding his medication.

In addition, on July 25, 2005, Nurse Sokolski was aware that Miller had a long history of threatening to commit suicide and attempting to commit suicide. In fact, it is undisputed that Miller had attempted to hoard his medication several months prior to July 25, 2005 in an effort to commit suicide. Thus, it is understandable that Nurse Sokolski may have been predisposed to interpret Miller's aberrant behavior as potentially dangerous.

Because no reasonable jury could find that Nurse Sokolski's hoarding allegation was

---

[8] Miller provides no evidence that would suggest that Nurse Sokolski had any other motive to see Miller's hands other than Nurse Sokolski's concern that Miller was hoarding medication.

pretextual, Miller has not identified any material facts that could lead a jury to reasonably conclude that Nurse Sokolski violated his Eighth Amendment right to be free from cruel and unusual punishment. Therefore, I will grant Nurse Sokolski's Motion for Summary Judgment.

### b) Dr. Fishstein

Dr. Fishstein concedes that Miller's mental health issues satisfy the "serious medical needs" prong of the deliberate indifference standard, but he argues that Miller has failed to adduce evidence that Dr. Fishstein was deliberately indifferent to those needs.

Miller claims that Dr. Fishstein is guilty of deliberate indifference because he discontinued Miller's psychotropic medications for non-medical reasons, i.e., to punish him, and then failed to provide adequate treatment for Miller after taking him off the powerful medications. Dr. Fishstein argues that he had a valid medical reason for all of his actions, that Miller cannot prove a causal relation between the discontinuance of his psychotropic medications and any physical injuries he suffered,[9] and that he is protected by qualified immunity. I find that Miller has raised genuine issues of material fact regarding Dr. Fishstein's behavior and will deny the doctor's motion for summary judgment.

### i. Genuine Issue of Material Fact Regarding Deliberate Indifference

Dr. Fishstein claims that he discontinued Miller's psychotropic medications after Nurse Sokolski reported that Miller was hoarding his medication. Dr. Fishstein explained that "[i]t was a clear-cut decision to preserve life and get him in a safe place. . . . Those meds weren't saving

---

[9] Under the Prisoner's Litigation Reform Act, 42 U.S.C. § 1997e(e), prisoners may not obtain compensatory damages if they cannot prove that they suffered physical injury. *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) (noting, however, that § 1997e(e) does not preclude nominal or punitive damages or injunctive or declaratory relief in the absence of physical injury).

his life . . . You can't rise above the idea that they could be a tool for suicide." (Opp., Fishstein Mot., Ex. F, Fishstein Dep. 47:14-21.)

Miller contends that he was not hoarding his medications on July 25, 2005. Instead, he believes that Dr. Fishstein discontinued his psychotropic medications for nonmedical reasons such as fear or retribution. To support his claim, Miller points to the same statements he highlighted in his claim against Nurse Sokolski; namely, that grievance officials, Dr. Maue, and Dr. Fishstein himself all indicated that Miller's medications were discontinued, in part, because he was aggressive towards the staff. Miller argues that his aggressiveness should not have been a factor in the decision to discontinue the medications.

Given that I have already determined that Nurse Sokolski had a reasonable subjective fear that Miller was hoarding his medication, Miller's facts and assertions do nothing to contradict Dr. Fishstein's statement that his initial decision to discontinue Miller's psychotropic medications was based on a concern that Miller was engaged in hoarding and was a danger to himself and others.

However, Dr. Fishstein's actions in the wake of his discontinuance order are troubling when viewed in the light most favorable to Miller. Dr. Fishstein contends that after he discontinued Miller's medications and ordered him to be placed in a POC, he continued to treat Miller and remained involved in Miller's care through reports from staff psychologists. Dr. Fishstein's own records, however, belie his contentions. In his deposition, Dr. Fishstein noted that he would start an average day by going to the POC to conduct "close supervision" of persons "who may be psychiatrically ill, homicidal, violent, [etc.]" (*Id*. at Ex. F, Fishstein Dep. 8:9-23.) Dr. Fishstein later explained that if he sent an inmate to the POC, he would check in on that inmate the

following morning to look at the inmate's chart and evaluate him.

When asked if Dr. Fishstein did that on July 26, 2005, Dr. Fishstein could not recall. There is no indication in Miller's records that he did so. In fact, the records suggest that Dr. Fishstein first attempted to see Miller on August 30, 2005, a full month after discontinuing his powerful psychotropic medications, and did not actually examine him until October 4, 2005.[10] (*See id*. at Ex. K). At that visit, Dr. Fishstein concluded that Miller had no clinical need for his psychotropic medications, and he recommended that psychology monitor and track Miller's status. (*Id*. at Ex. N.) A month later, Dr. Fishstein reexamined Miller and confirmed that Miller was stable and had no need for psychotropic medication. (*Id*.)

Dr. Fishstein's motives in failing to follow up with Miller are questionable. Dr. Fishstein openly described his relationship with Miller as volatile; he also admitted that he feared Miller and that this affected his ability to do his job. For example, Dr. Fishstein stated in his deposition that "on every visit [Miller] consistently . . . was the same. . . . Before you could even say hello, he was screaming and cursing and telling us all to drop dead and F you, whatever, all the worst things." (*Id*. at Ex. F, Fishstein Dep. 28:1-9.) In one instance, Dr. Fishstein encountered Miller out of his cell. Even though Miller was sitting at a table with an officer next to him, Dr. Fishstein was too "frightened" to have a conversation with Miller; he immediately left the area, fearing that the situation could turn "ignitable." (*Id*. at Ex. F, Fishstein Dep. 55:20-56:10.) In

---

[10] Dr. Fishstein argues that he saw Miller on July 30, 2005, but the medical records he points to show that the date was "6/30/2005," which is June 30, 2005. There are notations in Miller's medical records that show that Miller was seen twice on July 30, 2005, but it is not clear who authored those notations. Moreover, it is unclear whether the information, which included the observations that Miller was angry, had spread feces throughout his POC, had tied a sheet to his door, and had apparently injured himself, was ever transmitted to Dr. Fishstein. (Opp., Fishstein Mot., Ex. L.)

another example of Dr. Fishstein's attitude towards Miller, when asked by Miller's counsel how one could determine whether an inmate was taking medication, Dr. Fishstein responded, "I have to say this to you, I mean, you met this man, right? . . . You can't get near him. I mean, he throws urine and feces, spits, has a shield up most of the time, [he] is dangerous." (*Id*. at Ex. F, Fishstein Dep. 65:16-23.)

For a claim of deliberate indifference I may not question a doctor's clinical judgment with respect to the course of an inmate's treatment. *See United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("Where a prisoner has received some medical attention and the dispute is over adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." (quotation marks omitted)). To make a reasoned medical decision, however, Dr. Fishstein needed to actually examine Miller. Viewed in the light most favorable to Miller, however, it appears that Dr. Fishstein did not even attempt to see Miller until August 30, 2005 and did not actually see him until October 4, 2005. Such a failure to provide follow-up care is conduct which "offend[s] evolving standards of decency . . . [and is] repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 106 (quotation marks omitted); *see also Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) (failure to follow up on inmate going through methadone withdrawal); *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006) (failure to procure follow-up treatment for inmate with fractured thumb); *Keller v. County of Bucks*, No. 03-4017, 2005 WL 675831, at *1 (E.D. Pa. March 22, 2005) (failure to provide follow-up care for inmate with MRSA infection); *Robey v. Chester County*, 946 F. Supp. 333, 337-38 (E.D. Pa. 1996) (failure to check in on inmate after he was taken off suicide watch). Therefore, it is evidence from which a reasonable jury could

conclude that Dr. Fishstein was deliberately indifferent to Miller's medical needs.

Dr. Fishstein argues that even if I decide that, under facts construed in the light most favorable to Miller, a jury could reasonably conclude that he was deliberately indifferent to Miller's serious medical needs, I should still grant his motion for summary judgment because Miller cannot prove causality and the doctor is protected by qualified immunity. Dr. Fishstein's argument fails on both counts.

### ii.  Causal Connection between Discontinuance and Injury

Dr. Fishstein argues that summary judgment is appropriate because Miller cannot show a "close causal connection" between the discontinuance order and any injury Miller suffered after July 25, 2005. *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996). Dr. Fishstein contends that after he gave the discontinuance order, Miller continued to demonstrate the same hostile, violent, suicidal behavior that Miller had displayed prior to the order.

Although there is no evidence that Miller's outward behavior differed before and after the discontinuance order, Miller recounted in a letter to Dr. Maue that after his psychotropic medications were discontinued, he "began hearing voices, feeling depressed, and very irritable." (*Id*. at Ex. A., Miller Dep. 33:14-15.) Miller also stated in his grievance appeal that he needed his medication to control his aggressive impulses. (*Id*. at Ex. P.) Moreover, Miller's expert witness, Dr. Kenneth Weiss, supports Miller's allegations that the abrupt discontinuance order had a negative impact on Miller's mood and behavior. (*See id*. at Ex. T.)

This evidence is sufficient to create a question of fact as to whether Miller suffered injuries due to the discontinuance of his psychotropic medication.

Dr. Fishstein also contends that he is entitled to qualified immunity.  Qualified immunity shields government officials from civil damages if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For a plaintiff to overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court denied qualified immunity to private prison guards.  Courts have since declined to extend qualified immunity to private medical providers under contract with state prisons.  *See, e.g.*, *Wolfe v. Horn*, 130 F. Supp. 2d 648, 656 (E.D. Pa. 2001); *see also Jensen v. Lane County*, 222 F.3d 570, 576-79 (9th Cir. 2000) (contract psychiatrist in county facility not entitled to qualified immunity), *Hinson v. Edmond*, 192 F.3d 1342, 1346-47 (11th Cir. 1999) (no qualified immunity for privately con-tracted medical director of a county jail).  Consequently, I will deny Dr. Fishstein's motion for summary judgment.

### c) Dr. Arias

Miller claims that Dr. Arias was deliberately indifferent to his medical needs for asthma, allergy, and migraine medication by refusing to provide Miller the medication in order to punish him for his behavior towards the prison staff.  Miller, however, has failed to demonstrate that the injuries he suffered were "serious," and therefore he has failed to meet his burden of proof.

In *Boring v. Kozakiewicz*, the Third Circuit explained that there are some injuries, like a gunshot wound, whose seriousness would be apparent to a lay person, whereas as other injuries

are not so easily classified as "serious" and require expert medical opinion. 833 F.2d 468, 473 (3d Cir. 1987). The court concluded that migraine headaches fit into the latter category. *Id*. An inmate might be able to demonstrate that migraine headaches rise to the level of a serious medical need that a lay person would recognize, but only if the inmate can provide evidence that the migraines are disabling. *See May v. Jones*, No. 1:07-CV-1787, 2009 WL 4793031, at *4 (M.D. Pa. Dec. 7, 2009) (noting that the inmate's migraines led to "excruciating" pain that "caus[ed] the plaintiff to vomit . . . [and] was so bad the plaintiff couldn't eat or sleep for two days" (quotation marks omitted)). Miller provides no such evidence in the present case. In fact, Miller presents no evidence at all that he was injured by the discontinuance of his asthma, allergy, and migraine medication. Miller was able to provide expert testimony with regard to the injuries he has suffered due to the denial of his psychotropic medications; his failure to do so for the injuries he has allegedly suffered due to the denial of his other medications is fatal to his claim against Dr. Arias. Therefore, I will grant Dr. Arias' motion for summary judgment.

### d) PHS

PHS argues that its motion for summary judgment should be granted because Miller procedurally defaulted his claims against the company by failing to identify it in any of his grievances. It is unnecessary to examine the procedural default issue, because Miller admits that he cannot succeed in his § 1983 action against PHS. (*See* Mem. Supp. Opp. Mot. Summ. J. of PHS, at 3 n.1 (admitting that Miller "has no reason to believe that [PHS] maintained a policy, procedure or custom of denying medication").) Consequently, I will grant PHS's motion for summary judgment.

### B. Retaliation and Fourteenth Amendment Violations

Miller directs his final two claims under § 1983 against Secretary Beard and Superintendent DiGuglielmo, both in their official capacities.  First, Miller claims that Beard and DiGuglielmo were responsible for transferring Miller from SCI Graterford to SCI Camp Hill in retaliation for Miller's filing of the present action.  Second, Miller claims that Beard and DiGuglielmo were responsible for depriving Miller of his right to due process because they regularly transferred Miller to the SCI Graterford's RHU without providing him a hearing as required under 37 Pa. Code § 93.11 and DOC inmate disciplinary procedures.  Because Miller no longer wishes to be returned to SCI Graterford, his retaliation and due process claims shall be denied as moot and summary judgment will be granted for Beard and DiGuglielmo.

Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff suing state officials in their official capacities may seek prospective relief, but not retrospective money damages.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997).  However, "[i]f developments occur during the course of adjudication that . . . prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).

In his Second Amended Complaint, Miller requested an injunction ordering Secretary Beard to transfer Miller from SCI Camp Hill back to SCI Graterford.  However, Miller has since withdrawn his request to be transferred to SCI Graterford, as he prefers to remain at SCI Pittsburgh.  (Mem. Supp. Opp. to Dr. Fishstein's Mot. Summ. J., at 18 n.10.)  Miller now seeks only money damages for his retaliation claim.  (*Id.*)  Because Miller no longer seeks a transfer to SCI Graterford and he may not seek money damages against Secretary Beard or Superintendent

DiGuglielmo because he has sued them only in their official capacities, his retaliation claim shall be denied as moot.

Miller never requests specific relief for his due process violation claim. The most likely relief he could have requested from the court would have been an order enjoining Beard and DiGuglielmo from allowing Miller to be placed in the RHU at SCI Graterford without receiving a hearing. However, Miller is no longer an inmate at SCI Graterford and has provided no evidence that he is subject to the same conditions at SCI Pittsburgh. Consequently, his due process violation claim shall be denied as moot as well. *See Weaver v. Wilcox*, 650 F.2d 22, 27 & n.13 (3d Cir. 1981) (citing cases in which courts declared moot the injunctive and declaratory relief claims of prisoners who had been transferred away from the conditions they attempted to challenge).

### V. CONCLUSION

For the reasons enumerated above, I will grant the summary judgment motions of Nurse Sokolski, Dr. Arias, PHS, Secretary Beard, and Superintendent DiGuglielmo. I will deny Dr. Fishstein's motion for summary judgment.

s/Anita B. Brody

_____

ANITA B. BRODY, J.